UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

JOANNE M. OGDEN,

                    Plaintiff,

        v.

PUBLIC UTILITY DISTRICT NO. 2
OF GRANT COUNTY, doing business
as Grant County PUD,

                    Defendant.

NO:  2:12-CV-584-RMP

ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY
JUDGMENT

BEFORE THE COURT is Defendant's Motion for Summary Judgment,

ECF No. 40, amended as ECF No. 72.  The Court has reviewed the record and the

pleadings contained therein, and is fully informed.

BACKGROUND

This case was first filed in October of 2012, and has been reassigned twice

and continued numerous times.  The Court previously issued numerous orders

regarding the parties' respective motions to strike, *see* ECF Nos. 141 and 143, and

Plaintiff's motion for partial summary judgment, *see* ECF No. 172.  The parties

and the Court, therefore, are familiar with the facts of this case, but the Court

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT ~ 1

nonetheless briefly summarizes the nature of this lawsuit.  Plaintiff brings this suit against her former employer, Grant County PUD (PUD), alleging violations of the Family Medical Leave Act (FMLA), the Americans with Disabilities Act (ADA), and state law claims over which the Court exercises supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

Plaintiff, Joanne Ogden, was hired by PUD in 2007 as an Administrative Support Services Supervisor in the Hydro Division, which was run by Director Dawn Woodward.  Plaintiff was placed on a "Career Path" that set out benchmarks with corresponding wage increases.

On October 24, 2008, Plaintiff was diagnosed with cancer, and neither party disputes that cancer is a disability as it relates to this suit.  What happened at Plaintiff's workplace after that diagnosis serves as the basis for Plaintiff's claims. Plaintiff alleges causes of action regarding to whom that diagnosis was disclosed, how she was treated, and her ability to exercise her rights as a disabled employee. She took many separate periods of leave following her diagnosis, but only two are at issue in this case: from February 25, 2010, to April 19, 2010, and from September 10, 2010, to January 3, 2011.  Plaintiff alleges that her FMLA rights were violated in addition to violations of the ADA and state law claims.

Upon her return to work in January 2011, Plaintiff was assigned to a Technical Writer position, a position to which she previously had applied, but had withdrawn her application.  After her return, Plaintiff felt that she faced retaliation

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 2

1    for exercising her rights, and felt discrimination: "isolation, shunning, public

2    humiliation, change in work location, demotion, and ultimately, constructive

3    discharge." ECF No. 26 at 3. After Plaintiff complained to the PUD, she alleges

4    that only a "sham investigation" was completed, *see id.* at 4, and that her work

5    conditions only worsened until she resigned from the PUD in June of 2012.

6    Plaintiff seeks damages for past and future economic loss, emotional

7    distress/mental anguish, liquidated damages, prejudgment interest, and attorney's

8    fees and costs.

9                                          ANALYSIS

10           The moving party is entitled to summary judgment when there are no

11    disputed issues of material fact when all inferences are resolved in favor of the

12    non-moving party. *Northwest Motorcycle Ass'n v. United States Dep't of Agric.*,

13    18 F. 3d 1467, 1471 (9th Cir. 1994); FED. R. CIV. P. 56(c). If the non-moving party

14    lacks support for an essential element of their claim, the moving party is entitled to

15    judgment as a matter of law regarding that claim. *See Celotex Corp. v. Catrett*,

16    477 U.S. 317, 323. Importantly, at the summary judgment stage, the Court does

17    not weigh the evidence presented, but instead assumes its validity and determines

18    whether it supports a necessary element of the claim. *Id.* To prevail at the

19    summary judgment stage, a party must establish that a fact cannot be genuinely

20    disputed and that the adverse party cannot produce admissible evidence to the

21    contrary. FED. R. CIV. P. 56(c). Once the moving party has met their burden, the

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT ~ 3

1  non-moving party must demonstrate that there is probative evidence that would

2  allow a reasonable jury to find in their favor.  *See Anderson v. Liberty Lobby*, 477

3  U.S. 242, 251 (1986).

4        As a preliminary matter, the Court addresses the nature of the filings in this

5  case.  Significant issues repeatedly arose in the thousands of pages worth of filings

6  regarding Defendant's motion for summary judgment.  Evidence is defined as

7  "[s]omething (including testimony, documents, and tangible objects) that tends to

8  prove or disprove the existence of an alleged fact . . . ."  *Evidence*, BLACK'S LAW

9  DICTIONARY (10th ed. 2014).  An allegation alone does not constitute evidence, no

10  matter how many times that exact same allegation is repeated and refiled under

11  different headings, to support different claims, and in different documents.

12        Throughout this case, Plaintiff's counsel has refiled the exact same

13  documents, motions, or quotes numerous times.  Throughout Plaintiff's responses

14  to Defendant's motion, Plaintiff's counsel attempts to create issues of material fact

15  by arguing that Defendant's arguments are "demonstrably false," or by making

16  other similar claims, *see e.g.*, ECF No. 94 at 11, instead of submitting evidence.

17  Evidence regarding the elements of a legal claim can create a genuine issue of

18  material fact; bare, conclusory allegations of demonstrable falsity cannot.

19        Additionally, Plaintiff's Statement of Facts, ECF No. 101, contains legal

20  conclusions and summaries of testimony that are belied by the records upon which

21  they rely.  Counsel repeatedly cites to his own declaration as support for "facts"

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT ~ 4

about which he has no personal knowledge.  *See id*.  Even more troubling, there is mischaracterization of the evidence that counsel purports to summarize, and deposition transcripts demonstrate that counsel sometimes attempts to finish a witness's sentence to make the testimony consistent with counsel's theory of the case.  *See* ECF No. 95 at 70.  Defendant has moved successfully to strike some of the statements.  *See* ECF No. 143.  Despite these errors and shortcomings, and in accordance with the summary judgment standard, the Court has viewed all evidence in the light most favorable to Plaintiff.

Defendant moves this Court for summary judgment on eight different grounds in an attempt to dispose of all of Plaintiff's claims which include federal causes of action pursuant to the Family Medical Leave Act (FMLA) and the Americans with Disabilities Act (ADA), and state causes of action for violations of the Washington State Family Leave Act (WFLA), the Washington Law Against Discrimination(WLAD), a "handbook claim," and for negligent infliction of

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 5

emotional distress.  This Court addresses each of Defendant's arguments in favor of summary judgment in turn.[1]

## I.  Defense argument #1 – Plaintiff has no claim under the FMLA.

The Family Medical Leave Act provides eligible employees with certain protections when enumerated circumstances require them to take time off from work.  The Act provides in relevant part, "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period for one or more of the following: . . . . [including] a serious health condition that makes the employee unable to perform the functions of the position of such employee."  29 U.S.C. § 2612.  In addition to mandating that employers allow such covered leave, the Act provides that

> any eligible employee who takes leave under section 2612 of this title for the intended purpose of the leave shall be entitled, on return from such leave-- (A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or (B) to be restored to an equivalent

---

[1] The Court proceeds by addressing the sections of Defendant's motion in turn but notes that many of Plaintiff's claims apply to a number of the following sections. For example, Plaintiff's allegations of harassment or Defendant's failure to investigate complaints relate to Plaintiff's claims under the FMLA, the ADA, and other causes of action.  Therefore, wherever the Court addresses one of Plaintiff's arguments, such discussion shall also apply to all other portions of this case where that argument arises.

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 6

position with equivalent employment benefits, pay, and other terms and conditions of employment.

29 U.S.C. § 2614.

An "eligible employee" is defined as one who has been employed "for at least 12 months by the employer with respect to whom leave is requested under section 2612 of this title; and for at least 1,250 hours of service with such employer during the previous 12-month period." 29 U.S.C. § 2611. The burden of proving eligibility for the FMLA rests on a plaintiff who asserts a violation of an FMLA-based right. *See Kohama v. McCabe*, 197 F. App'x 535, 537 (9th Cir. 2006) (unpublished memorandum affirming the dismissal of a claim on summary judgment for the Plaintiff's inability to prove that he had worked the requisite 1,250 hours). "[T]o maintain a cause of action under the FMLA . . . Plaintiff must show that she was still protected by the 12–week leave period mandated by the FMLA." *Farina v. Compuware Corp.,* 256 F. Supp. 2d 1033, 1054 (D. Ariz. 2003).

Pursuant to 29 C.F.R. § 825.200, if an employee meets the other qualifying requirements, an employer may choose one of four different methods for determining the twelve-month period in which the twelve weeks of leave entitlement take place. They include:

(1) The calendar year; (2) Any fixed 12–month leave year, such as a fiscal year, a year required by State law, or a year starting on an employee's anniversary date; (3) The 12–month period measured forward from the date any employee's first FMLA leave [] begins; or, (4) A "rolling" 12–month

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 7

period measured backward from the date an employee uses any FMLA leave
[].

29 C.F.R. § 825.200.  As outlined in their leave policy, Defendant uses the third

method of calculating the twelve-month period.[2]  *See* ECF No. 74-20.

Although Plaintiff only presents arguments regarding two periods of what

she claims were FMLA leave periods (February 25, 2010 – April 19, 2010, and

September 10, 2010 – January 3, 2011), there are nine separate periods that

provide context to the issue of Plaintiff's FMLA eligibility.  Defendant, through

the amended declaration of HR Professional II Karrie Buescher, ECF No. 74-1,

and her supporting documents, ECF Nos. (74-2)-(74-25), submits the following

arguments and information regarding each of the nine leave periods:

- October 27, 2008 - March 16, 2009: The first twelve weeks were

    approved as FMLA leave, but the remaining eight weeks were not.

    During this time period, Defendant also provided a letter to Plaintiff

---

[2] Plaintiff alleges that although Defendant's employee handbook refers to the third

method, "in practice the PUD did not follow option (3)."  ECF No. 94 at 5.

However, the method that Plaintiff alleges that Defendant uses mirrors the third

method, just using different terminology.  *Id*.  Despite Plaintiff's assertion that the

policy is not applied uniformly, there is no evidence to support this claim.

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT ~ 8

notifying her that she had exhausted her twelve weeks of FMLA leave on January 19, 2009.  *See* ECF No. 74-4.

The Court notes that although Defendant approved of Plaintiff's leave and allowed her to extend beyond when she was eligible, Defendant did not have to do so.  In fact, Defendant could have terminated Plaintiff's employment entirely after she did not return to work at the end of her twelve weeks of FMLA leave and would have been in compliance with the express terms of the FMLA.  *See Farina*, 256 F. Supp. 2d at 1054.

- August 3, 2009 – October 4, 2009: Again, by letter dated August 14, 2009, Defendant notified Plaintiff that she had exhausted her twelve weeks of FMLA leave.  *See* ECF No. 74-7.

- October 19, 2009 – December 14, 2009: Defendant was reminded by letter on October 21, 2009, that she had exhausted her twelve weeks of leave.  *See* ECF No. 74-10.  On October 27, 2009, Plaintiff would have been entitled to another twelve weeks of FMLA leave had she worked 1,250 hours in the preceding twelve months.  However, Defendant's records show that Plaintiff only worked 746.50 hours in the twelve months preceding October 27, 2009.

- December 14, 2009 – January 11, 2010: Plaintiff was working partial days due to the limitations provided by her medical provider.

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 9

Defendant's records show that Plaintiff still had only worked 746.50 hours in the twelve months preceding December 14, 2009.

- February 25, 2010 – April 19, 2010: As of February 25, 2010, Defendant's records show that Plaintiff only worked 1,069.50 hours in the twelve months preceding February 25, 2010.  Additionally, there is an email between HR representatives Karrie Grant and Darla Shannon sent on September 21, 2010, that documents their determination that Plaintiff's FMLA leave had ended on March 26, 2010.  *See* ECF No. 74-23.

Again, since she had used more than twelve weeks of FMLA leave and was not ready to return to work at the exhaustion of that time, Defendant could justifiably have terminated Plaintiff's employment at this point.

- June 17, 2010 – June 21, 2010: Defendant's records show that she was on leave, but was not eligible for FMLA leave because she only had worked 875.50 hours in the preceding year.

- September 10, 2010 – January 3, 2011: Defendant's records reflect that Plaintiff only had worked 1,054.50 hours in the year preceding September 10, 2010, making her ineligible for FMLA leave.  She also had exhausted her FMLA leave allotment until the beginning of her new rolling year which would begin on October 27, 2010.  On October 1, 2010, Defendant sent Plaintiff a letter stating:

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 10

1
2

> Please be advised that your absence from work will be counted as leave under the Family and Medical Leave Act (FMLA). Please note, you have expired your 12 weeks of FMLA for the rolling year beginning 10-27-09. Your next rolling year begins 10-27-10.

3
4
5
6
7

ECF No. 74-22. However, on October 27, 2010, Defendant's records reflect that Plaintiff only had worked 994.50 hours in the preceding twelve months. Therefore, Plaintiff did not return to work at the expiration of her twelve weeks of FMLA leave, and was not eligible for a new entitlement of twelve weeks at the start of her next rolling year.

8
9
10
11
12

- February 4, 2011 – August 8, 2011: Plaintiff received benefits while being on short-term disability (STD) until August 4, 2011, which was when she exhausted her 180 days of that benefit. She then used personal leave (PL) from August 4, 2011– August 8, 2011. As of February 4, 2011, she only had worked 863.5 hours in the preceding twelve months.

13
14
15
16

- April 11, 2012 – June 13, 2012: In the year preceding this eight-week period of leave, Defendant's records show that Plaintiff only had worked 1,190 hours, making her ineligible for FMLA leave.

17
18
19
20

Despite Defendant's detailed records outlining when Plaintiff was on leave and which of those periods were or were not covered by the FMLA, Plaintiff responds that Plaintiff was eligible for FMLA, especially during the periods from February 25, 2010 – April 19, 2010, and September 10, 2010 – January 3, 2011,

21

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 11

1  and that she had not exhausted her FMLA entitlement of twelve weeks per twelve-

2  month period.  *See* ECF No. 94 at 1-8.

3       Plaintiff cites to 29 C.F.R. § 825.110 for the proposition that, "[i]n the event

4  an employer does not maintain an accurate record of hours worked by an employee

5  . . . the employer has the burden of showing that the employee has not worked the

6  requisite hours."  *Id*. at 3.  However, Plaintiff fails to provide any reason to doubt

7  the accuracy of Defendant's extensive records.

8       Plaintiff's counsel asserts that "Ogden worked more than 1,250 hours in 12

9  months preceding her February 25, 2010-April 19, 2010 and September 10, 2010-

10  January 3, 2011 leaves," ECF No. 94 at 3, and to support that conclusory

11  allegation, argues that as a salaried employee, she "worked more than 8 hours per

12  day when she was not on leave, also including weekends, and she also performed

13  work while she was on FMLA leave."  *Id*. at 3-4.  Although Plaintiff provides

14  declarations with conclusory allegations that give anecdotal evidence that

15  sometimes Plaintiff had long days or worked weekends or worked during leave,

16  Plaintiff fails to provide any record of those hours or any reason to dispute

17  Defendant's records or calculations.

18       At the summary judgment stage, the Court views evidence in the light most

19  favorable to the non-moving party, but the only evidence before the Court supports

20  Defendant's assertions that Plaintiff was not eligible for FMLA protection as she

21  alleges in this case.  The Court finds that there is no genuine issue of material fact

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT ~ 12

regarding Plaintiff's eligibility for FMLA protection as it pertains to her claims for two reasons. First, Plaintiff did not work the requisite 1,250 hours preceding either disputed period (February 25, 2010 – April 19, 2010, or September 10, 2010 – January 3, 2011). Second, and more importantly, she had exhausted her twelve weeks of leave (during the period from September 10, 2010 – January 3, 2011) and was not ready and/or willing to return to work at the expiration of that allotment.

It is not clear whether Plaintiff disputes that she had exhausted her twelve weeks of leave during the period between September 10, 2010, and January 3, 2011. Plaintiff's counsel argues that "[t]he fact that she may have exhausted the prior year's leave entitlement before then [referring to the start of a new rolling year on October 27] does not eliminate her leave entitlement from that date going forward." ECF No. 94 at 5.

Even if this Court ignores the fact that the only evidence before it supports the conclusion that Plaintiff was not eligible for FMLA leave on September 10 due to her insufficient hours worked, or that she would not be entitled to another twelve weeks of FMLA leave on October 27, 2010, for the same reason, the uncontroverted facts are: (1) Plaintiff was on leave that counted against the twelve-week maximum allotment and (2) prior to the beginning of her new rolling year on October 27, 2010, she had exhausted her leave and was not yet able to return to work. Therefore, at the time that she exhausted twelve weeks of FMLA leave and

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 13

was not ready to return to work, Plaintiff was not entitled to any FMLA-based rights.

Defendant was not required to restore Plaintiff to her same or equivalent position, and could permissibly have terminated her employment when she returned in January of 2011. *See Farina*, 256 F.Supp.2d at 1054 ("[S]he is only entitled to an equivalent position under the FMLA if she was prepared to return to work during a time designated as FMLA leave.").

Plaintiff also attempts to rely on an estoppel theory to argue that Defendant should be estopped from denying Plaintiff's eligibility because the PUD had approved her leave for February 25, 2010 – April 19, 2010, and September 10, 2010 – January 3, 2011. *See* ECF No. 94 at 6-7. Even if the Court ignores the numerous letters that explained to Plaintiff that she had exhausted her FMLA allotment of twelve weeks before or during both those time periods, Plaintiff's counsel only cites to his own Statement of Facts to support that the leave periods were approved as FMLA leave. *Id*. at 7. As discussed previously, counsel's statements alone are not competent evidence.[3]

---

[3] Plaintiff's Statement of Facts also cites to declarations of Plaintiff and her attorney. *See* ECF No. 101 at 3-4. These conclusory statements fail to create an issue of material fact regarding approval of FMLA leave. Counsel also provides a document, ECF No. 95-11, that refutes his assertions, as discussed below.

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 14

1    Additionally, Plaintiff appears to recognize that in order to prove estoppel

2    she must demonstrate that she relied on the PUD's designation of and approval of

3    FMLA leave.  *See* ECF No. 94 at 7.  Plaintiff argues that she "relied on the

4    approval in taking the leave.  Otherwise, she would have would have (sic)

5    attempted to postpone surgery and/or forego leave to which she would otherwise

6    be entitled."  *Id.* at 7-8.  The evidence before the Court refutes her assertion.

7    For the period from February 25, 2010 – April 19, 2010, Plaintiff cites to a

8    letter from PUD stating that the leave would be counted as FMLA leave.  *See* ECF

9    No. 95 at 99.  In fact, that letter only approved STD leave until April 12, not April

10   19th, and informs her that the period of leave from February 25 until April 12

11   would count against her twelve-week allotment of FMLA.  *See* ECF No. 95-11.

12   This misrepresentation by Plaintiff's counsel is material and relevant to this case

13   because Plaintiff repeatedly argues that she was forced to return to work while she

14   was still on FMLA leave on April 16, a position which the Court finds is not

15   supported by evidence and is not an accurate statement of the facts.

16   For the period from September 10, 2010 – January 3, 2011, Plaintiff argues

17   that Defendant "acknowledged the medical condition was covered under the Act,

18   and designated and approved the leave as FMLA-qualifying leave in its entirety."

19   Plaintiff misrepresents the record in a number of material ways.  That letter, ECF

20   No. 74-22, states that Defendant approved STD leave from September 10, 2010,

21   until November 10, 2010, not until January 3, 2011.  In addition to notifying

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT ~ 15

1   Defendant that this leave would count as leave under the FMLA, the very next

2   sentence reads, "Please note, you have expired your twelve weeks of FMLA for the

3   rolling year beginning 10-27-09." ECF No. 74-22. Therefore, she was told by

4   Defendant accurately that she would be using more FMLA leave than she was

5   allotted.

6       Additionally, the Court notes that these letters, upon which Plaintiff alleges

7   she relied when scheduling her leave, were dated after she began both of these

8   relevant periods of leave. *See* ECF No. 74-22 and 95-11. Plaintiff's own notes

9   demonstrate that she was sore and tired on September 10 and that her doctor told

10  her not to return to work until biopsy results came back from the lab. *See* ECF No.

11  102-6 at 10. Accordingly, there is no evidence to support her claim of reliance on

12  Defendant's approval, especially since that "approval" was much more limited

13  than Plaintiff asserts and informed her that she already had exhausted her FMLA

14  leave. Plaintiff has not created a genuine issue of material fact regarding estoppel

15  and the Court rejects the theory as it pertains to her FMLA claims.

16      Although the Court focuses on specific time periods regarding FMLA leave

17  and eligibility, the Court notes that Defendant's records, which Plaintiff fails to

18  refute with evidence, reflect that from the start date of Plaintiff's first leave period

19  on October 27, 2008, to the date of her final resignation, she worked a total of

20  3,092 hours and was off work for 4,459 hours (3,983.5 of which were on leave).

21  *See* ECF No. 74-1 at 11. Therefore, she spent 59 percent of this period on leave

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT ~ 16

and 41 percent working.  *Id*. at 12.  The extensive record in this case demonstrates a pattern of Plaintiff's being gone on FMLA or personal leave, being offended at having to explain absences, and of the PUD nonetheless making adjustments to allow her to take leave far beyond what the FMLA requires, while still having a position for her whenever she was willing or able to work.

Therefore, the Court dismisses Plaintiff's FMLA claims due to her inability to return to work at the expiration of her allotted twelve weeks per twelve-month rolling year.  However, the Court will address Plaintiff's individual FMLA claims.

## A.  Plaintiff's FMLA Claims

The FMLA provides two substantive causes of action when a plaintiff suffers interference with an exercise of FMLA-based rights, and/or retaliation/discrimination for the exercise of those rights.  *See* 29 U.S.C. § 2615. The statute reads in relevant part:

> (a) Interference with rights
> > (1) Exercise of rights
> > It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter.
> > (2) Discrimination
> > It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.

*Id*.  Plaintiff alleges claims for both interference pursuant to 28 U.S.C. § 2615 (a)(1) and retaliation pursuant to subsection (a)(2).  *See* ECF No. 26 at 5.

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 17

## 1.  Interference

To make out a prima facie case for FMLA interference, a plaintiff employee need establish that

> (1) [s]he was eligible for the FMLA's protections, (2) h[er] employer was covered by the FMLA, (3) [s]he was entitled to leave under the FMLA, (4) [s]he provided sufficient notice of h[er] intent to take leave, and (5) h[er] employer denied h[er] FMLA benefits to which [s]he was entitled.

*Crawford v. JP Morgan Chase NA*, 983 F. Supp. 2d 1264, 1270 (W.D. Wash. 2013) (quoting *Sanders v. City of Newport,* 657 F.3d 772, 778 (9th Cir. 2011)).

Plaintiff's response to Defendant's motion alleges four ways in which Defendant purportedly interfered with her FMLA rights: (1) "failing to reinstate her to her position of Administrative Support Services Supervisor or an equivalent position after she returned from leave," (2) "delaying advancement after she returned from leave," (3) "requiring her to work while she was on leave," and (4) "failing to investigate complaints of discrimination and retaliation after she returned from leave."  ECF No. 94 at 9.

Defendant's case is largely premised on the allegation that Plaintiff was "demoted" upon her return to work because she was transferred to a position as a Technical Writer rather than being returned to her former position as Administrative Support Services Supervisor.  *See e.g.*, ECF No. 94.  Plaintiff recognizes that the position was the same pay, but argues in relevant part that the position was not supervisory, presented less opportunities for advancement, was

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 18

1    less prestigious and was seen as such by other employees, and did not include the

2    benefits of being a supervisor.  *Id*. at 10.

3        Taking all the evidence in the light most favorable to Plaintiff and even if

4    the Court completely rejects Defendant's proffered justifications for the transfer

5    (despite the evidence supporting them in the record), the Court finds no issue of

6    material fact regarding a violation of the FMLA for transferring Ogden to the

7    position of Technical Writer.  As addressed previously, Plaintiff was not entitled to

8    any position when she returned from overusing leave beyond what she was entitled

9    to under the FMLA, but she was still provided with a position.  The Court need not

10   determine whether there is a genuine dispute over whether or not the position was

11   a demotion because a demotion, or termination, would have been permissible.

12       Although Defendant provided numerous justifications for the transfer,

13   Plaintiff focuses only on a comment from Plaintiff's supervisor, Dawn Woodward,

14   who allegedly stated that the transfer was due to Plaintiff's "tagging in and tagging

15   out."  *See* ECF No. 101 at 12.  Even if that were the only true reason for her being

16   transferred, which the Court does not hold, it still would be a permissible

17   justification.  Plaintiff used far more leave than was allowed under the FMLA, and

18   Defendant nonetheless returned her to a position that she had once applied for, but

19   that would not require supervising others.  The Court finds that expecting a

20   supervising employee to be present when her subordinates are at work is a

21   reasonable expectation for an employer to impose, so long as that expectation does

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT ~ 19

1  not interfere with FMLA-based rights.  Since Plaintiff was not able and willing to

2  return to work after the expiration of her allotted FMLA leave, Dawn Woodward

3  permissibly could transfer Plaintiff even if it had been due solely to her "tagging in

4  and tagging out."[4]

5          Even if Plaintiff had been eligible for more FMLA leave in January of 2011,

6  which the Court finds that she was not, the Court notes that the evidence strongly

7  supports the fact that Ogden's transfer was not a demotion.  Plaintiff had applied

8  for the position previously while she was working as the Administrative Support

9  Services Supervisor, and she later withdrew her application.  The Court notes that

10  Plaintiff's reasons for withdrawing her application vary depending on which

11  evidence that the Court considers: Ogden's declarations; her deposition testimony;

12  Plaintiff's counsel's summary of that testimony; or Plaintiff's own text message.

13  However, the undisputed fact remains that she applied for a position with equal

14  pay that she now argues was a demotion.

15

16

17  _____

18  [4] The Court recognizes that Plaintiff provided a number of declarations with bare,

19  conclusory allegations that Woodward had a practice of "getting rid of" or

20  discriminating against people who used FMLA leave or were disabled.  *See e.g.*,

21  ECF No. 96 at 5.  There is no support in the record for these conclusory claims.

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT ~ 20

1    Plaintiff also alleges interference due to the fact that PUD "delayed"

2  Ogden's advancement on the career path.  ECF No. 94 at 13.  Defendant cites 29

3  C.F.R. § 825.215(c)(2) for the rule that states:

4         if a bonus or other payment is based on the achievement of a specified goal
        such as hours worked, products sold or perfect attendance, and the employee
5         has not met the goal due to FMLA leave, then the payment may be denied,
        unless otherwise paid to employees on an equivalent leave status for a
6         reason that does not qualify as FMLA leave.  For example, if an employee
        who used paid vacation leave for a non–FMLA purpose would receive the
7         payment, then the employee who used paid vacation leave for an FMLA–
        protected purpose also must receive the payment.

8  ECF No. 72 at 6-7.

9    With that regulation in mind, Defendant's "delaying" Plaintiff's

10  advancement is justified by considering the following simple and undisputed

11  assertions: advancement on the career path is based on completing certain steps.

12  *See* ECF No. 54-1.  Plaintiff did not complete those steps, but was given more time

13  to do so.  *See* ECF No. 95-15.  Although Plaintiff had not yet completed those

14  steps, she still was given two separate pay raises on January 23, 2009, and on

15  August 27, 2010, as if she had satisfied all steps.  *See* ECF No. 54 at 10.  The pay

16  raise on August 27, 2010, only happened after Dawn Woodward recommended

17  that HR allow Plaintiff to receive the raise despite her not having finished the steps

18  on her path.  *See* ECF No. 102-2.

19    Plaintiff attempts to create issues of material fact regarding the

20  postponement of the deadline for her to complete the steps on her career path by

21

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT ~ 21

1  arguing that she had "completed the career path learning curve to the extent

2  necessary to approve her step increase requirements by June 16, 2009."  ECF No.

3  94 at 13.  Not only is this unsupported by anything beyond her own declaration and

4  that of her attorney, but Plaintiff also contradicts her own testimony with confusing

5  claims.

6      Ogden first claims that she was denied a pay (step) increase, "even though

7  she had completed the necessary criteria to receive a pay (step) increase," but that

8  Woodward told her it was because "she did not have enough 'face time' – meaning

9  she had been off on FMLA leave."[5]  ECF No. 101 at 7.  Two sentences after

10  arguing that Plaintiff had completed all necessary steps but was denied a pay raise

11  for lack of "face time," Plaintiff argues that she "put in a training request to attend

12  an educational seminar which would have filled a remaining task that Woodward

13  claimed was required before Ms. Ogden could have received a pay (step)

14  increase."  *Id*.  She then alleges Woodward tore up the request and threw it away.

15  *Id*.

16      Additionally, Plaintiff's counsel cites an unpublished Sixth Circuit case to

17  support his argument that "[w]here a detrimental decision regarding performance

---

[5] Plaintiff's counsel cites to his own declaration to support a legal conclusion in his

Statement of "Facts" when he is speculating as to what Woodward meant by her

comment.

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT ~ 22

1    and salary is made in proximity to FMLA leave [and] the protected absences are a

2    factor in the decision, it can be inferred that the employer interfered with the

3    employee's rights."  ECF No. 94 at 13.  However, any time when Plaintiff was at

4    work would have been in close proximity to a leave of absence given the fact that

5    Defendant's records show that from the time Plaintiff first took a leave of absence

6    in 2008 until she left the PUD in 2012, Plaintiff was on leave for more time than

7    she was at work.  Plaintiff's argument would require the Court to infer that every

8    adverse action be attributed to FMLA interference.

9         Taking Plaintiff's assertions to comprise one coherent story in the light most

10   favorable to Plaintiff, the Court concludes: Woodward told Plaintiff that she had

11   not completed all the steps necessary for a step increase but delayed Plaintiff's

12   deadline to complete those steps.  *Id*. at 8.  Even according to Plaintiff, she

13   "received the pay (step) increase despite the fact that the course Woodward

14   claimed was necessary remained incomplete."  *Id*.

15        Importantly, the unfulfilled prerequisites that Plaintiff implies are figments

16   of Woodward's imagination were explicitly listed on Plaintiff's Career Path

17   Record, which Plaintiff signed in February of 2008.  *See* ECF No. 54-1.  The

18   evidence demonstrates that Plaintiff received numerous pay raises for which she

19   would have been ineligible had Woodward not extended her deadline, and

20   Woodward recommended that Ogden be given a raise on August 27, 2010.

21

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT ~ 23

1  Therefore, Plaintiff has suffered no disadvantage and has stated no basis for an

2  interference claim or any other legal cause of action..

3      Although the only "proof" that would support the allegation that Woodward

4  tore up and threw away Plaintiff's request to attend trainings is Plaintiff's own

5  declaration and that of her attorney, the alleged event is immaterial.  Pursuant to 29

6  C.F.R. § 825.215(c)(2), Woodward could have denied pay increases and

7  advancement opportunities completely if Plaintiff had failed to meet requirements

8  due to her being on leave (absent evidence that she was being treated worse than

9  others who missed the same requirements due to non-FMLA leave), but

10  Woodward did not do so.  Instead, Woodward provided Plaintiff with benefits that

11  she had not yet earned.

12      As it pertains to Plaintiff's allegations regarding pay and the status of her

13  position, the Court recognizes that Plaintiff previously made vague allegations of

14  discrimination due to the way in which a subordinate was moved from her

15  supervision in 2009, which made her ineligible for a grade increase; or in the way

16  that she received a bonus payment as a lump sum rather than as a salary increase in

17  2010.  *See e.g.*, ECF No. 102 at 11-12.  Although Plaintiff does not refer to these

18  allegations in her opposition to Defendant's motion for summary judgment, the

19  Court has reviewed the evidence and considers these claims.  Plaintiff alleges that

20  her subordinate, Wendy Isensee, was receiving the same grade level of pay as she

21  was receiving in 2009, and when Plaintiff pointed this out to Woodward,

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT ~ 24

1    Woodward allegedly "told Ms. Ogden that she would move Isensee out from

2    underneath Ms. Ogden before she would give a grade increase to Ms. Ogden

3    because she did not feel she was worth the increase in pay."  ECF No. 95 at 71.

4          Regarding the bonus payment, Plaintiff alleges that she received a lump sum

5    payment equal to two percent of her salary instead of receiving a two-percent

6    increase to her salary amount, and seems to allege discrimination because some

7    other employees received a percentage increase.  *See* ECF No. 95-7 at 17.

8    Specifically, she alleges that she was told that she received a lump sum because

9    she was on a "learning curve," but that one of her subordinates, Wendy Isensee,

10   received the percent increase even though she was also allegedly on a learning

11   curve.  *Id.*  The Court finds that these allegations regarding the lump sum payment

12   or the removal of Isensee from underneath Ogden are not supported by evidence

13   and fail to create a genuine issue of material fact regarding any legal claim.

14         Plaintiff's third claim for FMLA interference alleges that Defendant required

15   her to work while she was on FMLA leave.  *See* ECF No. 94 at 12.  Once again,

16   this claim is supported only by her own declarations and statement of facts.

17   Defendant admits to contacting and checking on Plaintiff, but there is no evidence

18   that she was required to do anything while on FMLA leave.  The Court finds that

19   both parties recognize that Plaintiff came to work on April 16, 2010, to meet with

20   Woodward and Broadsworth on a day that Plaintiff alleges was intended for leave.

21   However, Plaintiff was given credit for the hours she put in on that day, *see* ECF

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT ~ 25

No. 74-19 at 14, and fails to provide any evidence that Defendant forced to her to be there.  In fact, as outlined above, the evidence Plaintiff has submitted demonstrates that she only was approved for FMLA leave until April 12, ECF No. 95-11, so having a meeting on April 16 would have been outside of that window of approved leave.

Furthermore, FMLA leave does not serve as a no-contact order on employers regarding an affected employee.  Therefore, Plaintiff fails to create a genuine issue of material fact regarding her allegations of being forced to work while on FMLA leave.

Plaintiff's fourth allegation of interference relies on her assertion that Defendant failed to investigate her complaints of discrimination and rests solely on her own conclusory statements.  Plaintiff alleges that in addition to her own complaints, there were other reports from other PUD employees, HR Generalist Brook Fankhauser, and even an outside consultant, but "not a single investigation was ever completed into allegations of discrimination / retaliation regarding Ms. Ogden."  ECF No. 94 at 24-25.

Contrary to Plaintiff's assertions, the record demonstrates that Defendant extensively worked to investigate Plaintiff's claims, and it was Plaintiff who chose not to pursue them any further before filing the present suit.  The following quotes from Plaintiff's own answers to Defendant's interrogatories demonstrate the frivolity of this claim:

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 26

- "Darla asked me if I wanted to lodge a complaint and I said yes. We met on March 15th, 2012 at Priest rapids Dam for almost 4 hours."
- "About 9:20am (sic) on March 21, 2012, Darla arrived to give me the draft version of my statement she had prepared . . . She told me than (sic) she would be talking to Dawn about limiting contact hopefully today if time permitted."
- "On March 28, 2012, at about 12:15 Darla, called to let me know they were meeting at HR at 1:30 p.m. Darla showed up at 1:55pm (sic). The meeting lasted until 5:15pm."
- "On April 2, 2012[,] Darla dropped off the edited version of my statement . . . she asked that I make electronic changes."
- "On April 10, 2012 Darla sent me an email asking if I had reviewed the statement and made edits. I told her that my work load obligations had taken priority. I started on FMLA leave and did not return to work until June 13, 2012. There was [sic] no additional communications or follow up from Human Resources on my complaint. The investigation just stopped."

ECF No. 95-7 at 29-33.

This record, in Plaintiff's own words, establishes that Defendant continued to investigate her complaints and the investigation only stopped when Plaintiff decided not to respond because "her work load obligations took priority."[6] *Id.* at 32. Although the Court views evidence in the light most favorable to the non-moving party, the evidence before the Court demonstrates that there is no genuine

---

[6] The Court accepts the validity of Plaintiff's explanation that work took priority despite her own notes from a few months before then in which Plaintiff says "I find myself just staring into space . . . Usually after lunch I start counting down the time I have left in the day." ECF No. 102-6 at 29. Whether she was busy or not, the investigation ended with her inaction.

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 27

1   issue of material fact regarding Defendant's alleged failure to investigate.  The

2   Court finds that Plaintiff's allegation is unsupported by evidence and belied by the

3   record.

4           Plaintiff also alleges that no investigation even began "until just prior to Ms.

5   Ogden's medical providers' advisement that she must quit her job due to

6   discriminatory treatment."  ECF No. 94 at 25.  Although Plaintiff alleges a number

7   of occasions when Defendant violated PUD policy that would require employees to

8   investigate her complaints, she has failed to provide evidence that Defendant did

9   not do so at each of the times when her concerns were raised.  Accordingly,

10  Plaintiff fails to provide sufficient evidence to create a genuine issue of material

11  fact regarding this conclusory assertion.

12          The Court notes that throughout this litigation, Plaintiff brings claims based

13  upon allegations that are contradicted by her own actions.  For example, she came

14  to work on the same day that Defendant's counsel received a letter saying she was

15  "forced to quit," *see* ECF No. 44-18 at 3, or she alleges that the "investigation just

16  stopped," when the last communication from Defendant was asking Plaintiff if she

17  approved of the latest draft of her complaint.  The investigation only ended due to

18  Plaintiff's inaction and unwillingness to respond to Defendant's good faith efforts

19  to address her complaints.

20

21

## 2. Retaliation

Plaintiff alleges retaliation both in the Second Amended Complaint, ECF No. 26, and throughout this case.[7]   The court in *Crawford v. JP Morgan Chase NA*, 983 F. Supp. 2d 1264, 1269 (W.D. Wash. 2013), held that

> [u]nder the *McDonnell Douglas* framework, a plaintiff must establish a prima facie case of retaliation.  [411 U.S. 792 (1973)].  To establish a prima facie case of FMLA retaliation, a plaintiff must show (1) he availed himself [of] a protected right under the FMLA, (2) he was adversely affected by an employment decision, and (3) there is a causal connection between the two actions.  *Washington v. Fort James Operating Co.,* 110 F. Supp. 2d 1325, 1331 (D. Or. 2000).  If a prima facie case is established, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse action.  *Sanders* [*v. City of Newport*]*,* 657 F.3d [772,] 777, n. 3 [9th Cir. 2011].  If the employer articulates a legitimate reason for its action, the burden shifts back to the plaintiff to show the reason given is pretext.  *Id.* Pretext can be proven indirectly, by showing the employer's explanation is not credible because it is internally inconsistent or otherwise not believable, or directly, by showing unlawful discrimination more likely motivated the employer.

As previously stated, the Court finds no genuine issue of material fact regarding the first element: whether Plaintiff availed herself of a protected right under the FMLA, because the only evidence before the Court establishes that she

_____

[7] There is a great deal of overlap between the factual bases for Plaintiff's claims. Therefore, the Court's discussion of "retaliation" also addresses Plaintiff's factual arguments that she relies upon to claim discrimination, harassment, "isolation, shunning, public humiliation, change in work location, demotion, and ultimately constructive discharge."  ECF No. 26 at 3.

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 29

1  was ineligible to do so at all times relevant to this suit.  However, in light of the

2  extensive briefing by both parties regarding the second element, if the Court were

3  to accept that she had availed herself of an FMLA-protected right, the Court also

4  addresses whether there is a genuine issue of material fact regarding whether or not

5  she was "adversely affected" for doing so.[8]

6       Plaintiff's opposition to Defendant's motion for summary judgment cites to

7  Paul G. Mattiuzzi, Ph.D., *What is Workplace Retaliation?*, Everyday Psychology

8  (Aug. 23, 2015, 7:02 p.m.), http://everydaypsychology.com/2012/03/what-is-

9  workplace-retaliation-itsabout.html#.Vdp7ZGC4mR, for the elements of her claim,

10  and provides the following quotes: "What is workplace retaliation?  It is not what

11  people think it is."  *See* ECF No. 94 at 23.  "Retaliation is about discouraging

12  people from asserting their rights or complaining when such rights are denied."  *Id*.

13  "[R]etaliation is workplace terrorism, and you know it when you see it.  That is the

---

[8] Since Plaintiff relies on the same alleged facts to argue that she was adversely

affected and discriminated against for her disability in violation of the ADA, the

WLAD, and for her use of what she believed was FMLA leave, the Court's

discussion of these facts applies to each of these claims.

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 30

1  objective test that defines retaliation."[9]  *Id.*  While it may be true that acts of

2  retaliation and discrimination that could serve as the basis for a viable legal claim

3  may be of varying natures, the Court finds that Plaintiff's allegations of

4  Defendant's actions do not constitute retaliation or discrimination.

5        Plaintiff provides bare, conclusory allegations of harassment, a hostile work

6  environment, and discrimination without any evidence to support those claims.

7  Plaintiff's evidence, even viewed in the most favorable light, defeats her own

8  allegations of a hostile work environment.  The evidence establishes a pattern of

9  PUD employees offering comfort, assistance, and friendly gestures, that are

10  rebuffed by Plaintiff as "objectionable" and "ambush[es]," to which she often

11  responded with rude comments.  *See e.g.*, ECF No. 60-1.  Plaintiff's own notes

12  demonstrate that criticisms or sharing of concerns that others had expressed about

13  her were seen as harassment, and Defendant's comforting comments were often

14  met with Plaintiff's sarcasm and hostile responses.  *See e.g.*, ECF No. 102-6 at 44

15  (4/10/2012 entry).

16        Plaintiff alleges conversations took place that demonstrated hostility or

17  discrimination, but the claims are belied by uncontroverted evidence.  For

18

19

20  [9] While an opinion from a psychology-focused blogpost may be an interesting

   anecdote, it has questionable value regarding the elements of a legal claim.

21

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT ~ 31

1    example, Plaintiff relies on the fact that she requested a day off and that Woodward

2    "pried into" her reasons.  She summarized the event as follows:

3            In the beginning of January 2010, I asked for a personal leave day for a
        doctor's appointment and for my husband's birthday.  My daughter also had
4       the day off that I was requesting off.  Dawn pried into my reason for the
        request and was not happy about me taking the day off because of a
5       company wide event.  She expressed her displeasure not only with words but
        also with body language that clearly told me that I should not be choosing
6       personal family time over a company wide event.  It was unprofessional and
        I felt as if I was a child being reprimanded by a parent.  This was also
7       evident in the email communications between Dawn and I [sic] concerning
        this particular request.

8    ECF No. 102 at 7.  However, that email exchange demonstrates that Woodward

9    simply asked, "Why the PL request for 1/18/10 – that is the District Wide Event

10   day?"  Plaintiff responded:

11           Yes I am aware that it is the DWE.  For multiple personal reasons I wanted
12      to spend time in Bothell with my family :)  Rick's birthday, a very important
        doctors [sic] appointment on Friday, and my daughter has the day off from
13      school.

14   ECF No. 102-4.  Woodward's response, which Plaintiff sees as unprofessional and

15   reprimanding, simply read, "OK. tx."  *Id*.  Plaintiff also claims that Woodward

16   didn't ask other employees the same question when they missed the district-wide

17   event, *see* ECF No. 95-7 at 14, but fails to provide any supporting evidence.

18           Furthermore, Plaintiff asked for the day off, and received exactly that; her

19   issue was with the fact that Woodward requested an explanation.  It seems that the

20

21

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT ~ 32

1    only way Woodward could have pleased Plaintiff would have been to allow her to

2    take time off without question, whenever she wanted to do so, and for any reason.

3        A few more representative examples demonstrate the nature of Plaintiff's

4    allegations of a hostile work environment.  Plaintiff had a problem with another

5    supervisor asking her whether she would be back from a different trip by a certain

6    date.  The question that offended Plaintiff was simply whether or not she would be

7    returning to work on March 12, referring to her taking time off to travel to Las

8    Vegas to watch NASCAR.  *See* ECF No. 102-6 at 34.  Her notes from the very

9    next day express her displeasure with her supervisors' "ongoing questions and

10   harassment every time I want time off," and point out that when another employee

11   needed time to care for a grandchild born prematurely, that "d[id] not seem to be

12   an issue."  *Id*. at 35.  Plaintiff received the time off and was only asked when she

13   would return.  The Court does not find such an inquiry, without more, to constitute

14   harassment or discrimination, but only an attempt to monitor employees.

15       Plaintiff's entire case rests on Plaintiff's allegations of hostility and

16   "bullying" by Dawn Woodward, but the evidence shows only a supervisor who

17   consistently expressed concern for Plaintiff.  Plaintiff has failed to establish that

18   Woodward's gifts to Plaintiff of a plant or an encouraging poem, or Woodward's

19

20

21

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT ~ 33

numerous attempts to say hello or check on Plaintiff, establish any hostility or

discrimination.

    In Plaintiff's own words, after Woodward shared the fact that employees had

expressed concerns about Plaintiff's management style, which the Court sees as a

routine duty for a supervisor in Woodward's position, Plaintiff declined

Woodward's attempted hug, and stated, "I told her I did not believe anything she

said and had nothing more to say and asked her to leave." *Id*. at 12.  Plaintiff's

other confusing allegations regarding an allegedly degrading "pinkie swear," or

how she was introduced as a "new employee," or of how she was fearful of

Woodward absent any evidence of a legitimate basis for that fear, fail to create an

issue of material fact regarding any legal claim.

    Plaintiff also alleges hostility from other employees and a lack of

communication or shunning from other PUD staff.  Another quote from her notes

demonstrates the nature of what she alleges was hostility:

> "Byron [B]ird came and sat by me for a couple if (sic) moments and asked
> for (sic) I was feeling and talked about his son leaving and his aging parents.
> I told him I do one day at a time.  I get tears every time I'm asked about my

health.  I don't trust my own gut right now or their motives.  Real concern or just fishing?"

*See* ECF No. 102-6 at 169.  To support claims of "shunning," her factual assertions are equally lacking and the basis of her feeling shunned seems only to be that people did not talk to her as much as she would have liked.  For example:

- After a coworker had a baby, Plaintiff stated, "I reached out to Lori and wished her well and asked about the child and wanted to see the photos that I had heard had been circulated.  I (sic) the past Lori never had any issues with sharing picture (sic) of her, her family, she played in a band which she shared her music with me (sic). She did responds (sic) and told me the Childs (sic) names and that she and the baby were doing well.  I never heard from her again.  ECF No. 95-7 at 24-25.
- Referring to a coworker, Jessica Alleman, Plaintiff alleged that "[e]verything (sic) I would walk in the door she would get on the phone or appear that she was deep into a work project and did not notice me.  I felt rejected."  *Id.* at 24.
- At a funeral for another coworker, she claimed that she had to sit alone, then one sentence later stated that Donna Kennedy offered her a seat three rows in front of her, but that she did not take it.  Plaintiff describes how people at the funeral avoided her and how she could "feel people looking at [her]."  *Id.* at 27.

These claims that a coworker responded to Plaintiff, but not to her satisfaction, of a coworker working studiously during work hours, or of being offered a seat at a funeral that Plaintiff rejected, are only a few representative examples of a pattern where Plaintiff brings legal claims for not being treated exactly as she wished.

Another illustrative example of the nature of Plaintiff's allegations is that to support her claim of an adverse employment action, Plaintiff stated that she "received telephone calls and emails inquiring about health and return to work over

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 35

1    a period of time . . . ." ECF No. 55-1 at 108. However, in her deposition

2    testimony, after not being able to state any specific issue that she had with any of a

3    number of such contacts, Plaintiff stated that "[i]t wasn't necessarily the content of

4    what was in the email. It was the sheer volume of people continually asking about

5    my health." *Id.* at 58. Therefore, Plaintiff attempts to prove an "adverse action"

6    based on people stopping by her office, emailing, or calling to ask her if she was

7    feeling alright. *See id.* However, if her coworkers were not stopping by, she

8    accused them of "shunning" her. *See* ECF No. 106-6. None of these allegations

9    support the existence of a material fact regarding any legal claim. The evidence

10   demonstrates that Plaintiff's colorization of Defendant's actions as harassing or

11   discriminatory are not supportable by evidence or logic.

12          Throughout this suit, Plaintiff also alleges that Defendant violated the law by

13   forcing her to disclose her personal medical information or sharing it against her

14   will. *See e.g.*, ECF No. 102 at 3. There is no evidence to support these bare,

15   conclusory allegations. This claim focuses heavily on two separate but related

16   meetings and on emails between PUD staff members. The first meeting occurred

17   on April 16, 2010, and was between Plaintiff, Mike Broadsworth, and Dawn

18   Woodward. Defendant claims that prior to that day, while Plaintiff was still out on

19   leave, numerous employees had complained about Plaintiff's management style,

20   specifically that she tended to micromanage, preferred one-on-one meetings over

21   group meetings, would speak negatively about staff members, and did not timely

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT ~ 36

respond to employees' requests for time off or schedule changes. *See* ECF No. 73-1 at 17 (citing ECF Nos. 47, 48, 50 and 51). Plaintiff does not dispute the fact that those complaints were made, but only responds by criticizing the complaining employees with allegations that "it was widely known that McIntyre, McMakin, Isensee, and Harris [the complaining employees] were part of a clique of sorts and was (sic) known to be destructive and cruel." ECF No. 101 at 43.

Defendant claims that the April 16, 2010, meeting was called in order to address the concerns raised by Ogden's staff. *See* ECF Nos. 73-1 at 17 and 101 at 43. However, Plaintiff repeatedly asserts that instead of addressing staff concerns, this meeting was called to force her to speak to her staff about her illness and emotional issues at a later meeting. *See e.g.*, ECF No. 101 at 9. She claims to have been "humiliated and angry after being told she would have to share her private medical status and related emotional issues, and this caused her a great deal of anxiety." *Id.* There is no evidence that Plaintiff was forced to speak about any medical issues and only that she was asked to communicate with her employees at a meeting on April 20th regarding the concerns of her staff.

Plaintiff's own notes state that Woodward told her that her staff felt unsupported because of a lack of communication and that "[s]he strongly encouraged me to talk to my staff about what my emotional state was because I hurt their feelings by not disclosing." ECF No. 102-6 at 8. There is no allegation that Woodward told her that she had to bring in pamphlets discussing the

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 37

emotional effects of cancer, which is what Plaintiff did at the April 20th meeting. Instead, Plaintiff's notes state that "[s]he encouraged me to share my feelings with the staff." *Id*. at 9.

Plaintiff's own descriptions of the meeting demonstrate that Woodward asked her to discuss her emotional reactions to others since that had become a work-related concern, but did not ask her to discuss the intimate details of her cancer diagnosis. Therefore, the evidence, absent bare, conclusory allegations, demonstrates that Woodward asked Plaintiff to address work-related concerns from Plaintiff's staff, and Plaintiff instead made it about her disability when she provided pamphlets and discussed her medical condition. Accordingly, there is no genuine issue of material fact regarding Plaintiff's assertion that she was forced to share medical information.

Separate from her claims of being forced to share medical information, Plaintiff also alleges that Woodward and her secretary, Cindy McClure, were sharing Plaintiff's personal medical information with PUD staff. *See e.g.*, ECF Nos. 94 at 21 and 102 at 6. It is not clear what legal basis Plaintiff relies upon for this claim, but Plaintiff cites this claim to support her allegations of retaliation (as an adverse employment action) and as evidence of discrimination and harassment in what she saw as a hostile work environment. *See* ECF No. 94 at 21.

The record is bereft of any evidence that would support the allegation that the disclosure of Plaintiff's medical information was in retaliation for her exercise

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 38

1  of FMLA-based rights (or rights pursuant to the ADA or WLAD).  The emails and

2  communications express relief at hearing good news regarding successful

3  surgeries, encourage positive thoughts and prayers on Plaintiff's behalf, and fit into

4  the pattern that defines this case: PUD employees reach out to Plaintiff to offer her

5  comfort, support, and encouragement, and Plaintiff interprets their actions as

6  retaliation, harassment, and the imposition of a hostile working environment.  *See*

7  *e.g.*, ECF No. 54-4.

8         Plaintiff alleges that PUD's failure to keep her information confidential was

9  a violation of a state administrative code, WASH. ADMIN. CODE §162-22-090(4).

10  *See* ECF No. 94 at 21.  Although the regulation pertains to how health care

11  information should be dealt with, in context, it relates to when and how an

12  employer may permissibly seek health care information regarding a disabled

13  employee to determine the effects of the disability and to provide adequate

14  accommodations.  *See* WASH. ADMIN. CODE § 162-22-090 (2016).  Here, the only

15  health information that was allegedly disclosed was what Plaintiff and her

16  husband, Richard Ogden, shared with Defendant.  The regulation does not apply to

17  Plaintiff's case.

18         Plaintiff's own deposition testimony illuminates the frivolity of this claim

19  regarding the disclosure of Plaintiff's medical information.  Plaintiff first alleged

20

21

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT ~ 39

that Woodward shared information regarding Plaintiff's hysterectomy and when

asked what basis she had for that belief, she responded,

> "What I heard – and it's hearsay –is that she – and what she had personally said to me was that I was extremely emotional, and I needed to get my hormones in check; and I understood she shared some of this information with other staff members."

ECF No. 55-1 at 31.  This vague and speculative statement with no factual

supporting evidence does not support any claim for relief.

The evidence in the record demonstrates that Plaintiff's husband, Richard

Ogden, updated Woodward on Plaintiff's status eight-to-ten times, *see* ECF No.

55-2 at 4-5, in very broad terms.  Mr. Ogden testified that Plaintiff "just wanted me

to tell her [Woodward] how the surgery went, I think, so you could kind of judge

how long she would be out for." *Id*. at 6.  Therefore, any information that was

disseminated was voluntarily offered and broad and relevant to when Plaintiff

would possibly return to work.

Plaintiff makes a vague assertion that she may have told Woodward not to

share any medical information at an earlier time, but definitively states that in

January of 2010, she warned Woodward not to communicate anything about her

medical information to her staff.  *See* ECF No. 55-1 at 50-52.  However, Plaintiff's

descriptions of what she specified as impermissible disclosures are vague and

1    unclear.  Her most specific recollection of any instruction to Woodward was "[t]hat

2    I wanted to keep all of my medical information private."  *Id.*

3        Similarly, Mr. Ogden does not allege that he asked Defendant not to share

4    the contents of his updates, and when asked whether he told Woodward not to

5    share the information in at least one of their conversations, he responded, "I had no

6    expectations one way or the other."  ECF No. 55-2 at 9.  This deposition testimony

7    appears to conflict with his later declaration where he stated that on October 29,

8    2008, "I expected Woodward would handle the situation as a professional

9    manager; that she knew the rules; and that Joanne's medical information would be

10   kept confidential."  ECF No. 100 at 2.  Even if he or Plaintiff had stated that desire

11   at the very outset of Plaintiff's diagnosis, the law does not punish employers for

12   expressing concern or forwarding such vague information.

13       A number of the emails that Plaintiff relies upon for this claim have been

14   submitted to the Court and they are void of any disclosure of sensitive medical

15   information.  The text of the relevant emails establish that Defendant only shared

16   the limited information that Plaintiff's husband chose to pass along at Plaintiff's

17   request.  *See* ECF No. 55-4.  As an example, an email from Dawn Woodward prior

18   to Defendant's warning not to disclose "medical information" read in its entirety:

19       I spoke with Rick shortly ago and Joanne is out of surgery.  The Doc said
         'everything looked pretty boring[,]'[] which is good news!!  Joanne is in
20       some pain now and is being medicated : ) Rick, Joanne, and family are
         relieved with the outcome.  Of course, there will be some follow up testing
21       to ensure no additional action is required.  Joanne will be in the hospital until

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT ~ 41

> Monday.  Rick will keep us posted.  Rick, Joanne and family are
> appreciative of the prayers and well wishes!  Jackie - please pass on to
> secretarial group.  Carol - please pass on to Tim and Chuck.  Tx much!
> Dawn

ECF No. 54-4.  The text of the one email that Woodward sent after Plaintiff's

warning read only "FYI –Just spoke with Rick; Joanne is out of surgery and is

recuperating at home.  Everything went fine."  ECF No. 54-5 at 3.  These emails

fail to support Plaintiff's bare, conclusory allegations of adverse employment

actions, harassment, the presence of a hostile work environment, or of Defendant's

revealing personal medical information without Plaintiff's permission.

Plaintiff's counsel also argues that Mike Broadsworth "ordered the staff not

to speak to Ms. Ogden" in January of 2011, ECF No. 101 at 15, apparently in an

attempt to "alienate Joanne in hope (sic) that she would quit," ECF No. 99 at 6.

However, Plaintiff fails to point out that her own attorney at the time had instructed

Defendant by letter (in bold letters): "Please be advised that you are not to have

any direct contact with Ms. Ogden.  If you wish to discuss any matter concerning

her employment, you may contact me at the above address and number."  ECF No.

44-1 at 2.

Plaintiff's then-attorney continued by warning Defendant that "[y]our

continued efforts to contact Ms. Ogden and continue her employment against her

wishes are considered ongoing harassment and retaliation."  *Id*.  Defendant is being

sued for complying with Plaintiff's attorney's instruction.  If Defendant contacted

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT ~ 42

1    Plaintiff, Plaintiff warned that it would be "harassment and retaliation," but if

2    Defendant instructed employees not to do so, as Mike Broadsworth allegedly did,

3    Plaintiff claims discrimination, shunning, and adverse employment actions.

4        Throughout this case, Plaintiff relies on her assertion that Woodward

5    suggested that she use a mood chart on her door to let people know what kind of

6    mood she was in.  *See e.g.*, ECF No. 94 at 20-21.  Even if the Court ignores

7    Defendant's allegations that Woodward first introduced this "mood chart" as a

8    potential management tool in 2007, *see* ECF No. 73-1 at 18, or that it had been

9    used by the other supervisors in the past, *see* ECF No. 52 at 7, the Court fails to see

10   how Woodward's suggestion amounts to an adverse employment action,

11   discrimination, harassment, contribution to a hostile work environment, or any

12   other legal claim that Plaintiff's counsel ties to this allegation.  Plaintiff may very

13   well have been upset and offended by the suggestion, but that is not the test of a

14   claim for discrimination or retaliation.

15       In dismissing a claim for retaliation, the Ninth Circuit Court of Appeals,

16   held that:

17       a supervisor's laughing and stating that the plaintiff "got him on sexual
         harassment charges," the supervisor's hostile stares, and increased criticism
18       were insufficient to preclude summary judgment dismissing the plaintiff's
         retaliation claim.  *See also Brooks v. City of San Mateo,* 229 F.3d [917,] 929
19       [9th Cir. 2000] (stating that badmouthing an employee outside the job
         reference context does not constitute adverse employment action); *Manatt* [
20       *v. Bank of America, NA*]*,* 339 F.3d [792,] 803 [9th Cir. 2003] ("Mere
         ostracism in the workplace is not grounds for a retaliation claim . . . ."); *cf.*
21       *Ray* [*v. Henderson*], 217 F.3d [1234,] 1243 [9th Cir. 2000] (definition of

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT ~ 43

1    "adverse employment action" "does not cover every offensive utterance by
2    co-workers, because offensive statements by co-workers do not reasonably
     deter employees from engaging in protected activity").

3    *Hardage v. CBS Broad., Inc.*, 427 F.3d 1177, 1189 (9th Cir. 2005) *amended on*

4    *denial of reh'g*, 433 F.3d 672 (9th Cir. 2006) *amended on denial of reh'g*, 436 F.3d

5    1050 (9th Cir. 2006).  Furthermore . . .

6        even if . . . remarks collectively created a hostile work environment that
         constituted retaliation, such harassment "is actionable only if it is
7        'sufficiently severe or pervasive to alter the conditions of the victim's
         employment and create an abusive working environment.'"

8    *Id.*

9

10        Accepting Plaintiff's evidence as true, the Court finds that suggesting the

11   use of a mood chart is not "sufficiently severe or pervasive" to sustain any legal

12   claim.  In light of the fact that there is no genuine issue of material fact regarding

13   the elements of any viable legal claim, Woodward's suggestion of a mood chart

14   does not serve as the basis for a cause of action.

15        Plaintiff's counsel also attempts to create an issue of material fact by

16   disputing issues that are irrelevant to any legal claim.  For example, Plaintiff's

17   Statement of Facts alleges that Woodward was lying about having sympathy for

18   Plaintiff due to her having lost a friend to cancer because Woodward's friend

19   apparently died after Plaintiff had already left the PUD.  *See* ECF No. 101 at 29.

20   In a similar way, to contest Defendant's assertion that Woodward and her

21   Administrative Assistant, Cindy McClure, drove to Ogden's home to give her a

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT ~ 44

poem and to help her pack for her trip to Western Washington for surgery,

Plaintiff's counsel argues, "Woodward and Cindy McClure did not help Ms.

Ogden pack." *Id*. at 31.

At the summary judgment stage, the Court determines whether or not there

is any genuine issue of material fact, "material" being the operative word.  Even if

Woodward lied about her friend or did not help Plaintiff pack her suitcase, those

facts are not material to this case.[10]  "Only disputes over facts that might affect the

outcome of the suit under the governing law will properly preclude the entry of

summary judgment.  Factual disputes that are irrelevant or unnecessary will not be

counted."  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

The Court finds that despite all of Plaintiff's factual allegations, Plaintiff has

failed to create a genuine issue of material fact regarding any retaliation claim.

## II.  Defense argument #2 - Plaintiff has no claim under the WFLA

In relevant part, the Washington Family Leave Act states:

(1) Subject to RCW 49.78.260, an employee is entitled to a total of twelve
workweeks of leave during any twelve-month period for one or more of the
following: … [including] (d) Because of a serious health condition that

---

[10] A material fact is defined as one that is "significant or essential to the issue or

matter at hand; esp., a fact that makes a difference in the result to be reached in a

given case. What constitutes a material fact is a matter of substantive law."  *Fact*,

BLACK'S LAW DICTIONARY (10th ed. 2014).

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT ~ 45

makes the employee unable to perform the functions of the position of the employee.

"The Washington Family Leave Act 'mirrors its federal counterpart and provides that courts are to construe its provisions in a manner consistent with similar provisions of the FMLA.'" *Crawford v. JP Morgan Chase NA*, 983 F. Supp. 2d 1264, 1269 (W.D. Wash. 2013) (quoting *Washburn v. Gymboree Retail Stores, Inc.,* 2012 WL 5360978, *7, 2012 U.S. Dist. LEXIS 156240, *21 (W.D. Wash. Oct. 30, 2012). This argument should be analyzed under the same standards applied to Plaintiff's FMLA claims. In light of this Court's granting summary judgment on the FMLA claims based on the foregoing discussion, summary judgment is properly granted regarding Plaintiff's WFLA claims as well.

**III. Defense arguments #3 and 4 – Plaintiff has no claim for failure to accommodate or for disability-based disparate treatment.**

### A. Americans with Disabilities Act

The ADA prohibits discrimination against a qualified employee based on the employee's disability.[11] *See* 42 U.S.C. § 12112. Such discrimination can include:

(A) not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an

---

[11] "Disability" is defined as: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment . . . ." 42 U.S.C. § 12102.

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 46

applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity; or (B) denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant.

42 U.S.C. § 12112(b)(5). Plaintiff alleges violations of the ADA for failing to accommodate her and for disparate treatment due to her disability.

## 1. Failure to accommodate

In order to establish a prima facie case for failure to accommodate under the ADA, a plaintiff must establish that

(1) [s]he is disabled within the meaning of the ADA; (2) [s]he is a qualified individual able to perform the essential functions of the job with reasonable accommodation; and (3) [s]he suffered an adverse employment action because of [her] disability.

*Samper v. Providence St. Vincent Med. Ctr.,* 675 F.3d 1233, 1237 (9th Cir. 2012) (citing *Allen v. Pac. Bell,* 348 F.3d 1113, 1114 (9th Cir. 2003) and 42 U.S.C. § 12112(a), (b)(5)(A) (requiring reasonable accommodation)).

The ADA defines "reasonable accommodation" as including:

(A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision

of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C.A. § 12111(9).

Defendant argues that Plaintiff admitted that Defendant approved every request for medical leave Plaintiff ever made and that the only accommodation denied was the extended work-from-home arrangement.  *See* ECF Nos. 72 at 10 and 95 at 14-16.  Defendant argues that Plaintiff was given the opportunity to work from home "for precisely the period recommended by her provider."  *Id*.

The extensive record in this case establishes a long record of accommodations being extended to Plaintiff and of Defendant's pattern of continuing to work with Plaintiff's demands regardless of whether or not they were reasonable.  *See e.g.*, ECF No. 44-3, 44-4, 44-5, 44-(8-15).  Viewing the evidence in the light most favorable for the Plaintiff, the Court finds a history of Plaintiff's requesting numerous accommodations, but being unwilling to supply proof of the reasonability of her proposed accommodations, and then pursuing litigation despite Defendant's efforts to accommodate her.  *Id*.

In response to Defendant's motion for summary judgment, Plaintiff narrows her arguments regarding the alleged lack of accommodations to two claims: (a) Defendant did not hold her position as an Administrative Support Services Supervisor open, and (b) "PUD failed to follow through with a promised accommodation to alter the chain of supervision so that Ogden would no longer be

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 48

1    supervised by Woodward."  ECF No. 94 at 16-17.  Assuming without deciding that

2    Plaintiff was disabled within the meaning of the ADA, the Court will address the

3    second and third elements of a claim for failure to accommodate as it pertains to

4    these allegations.

5                          **(a) Failure to hold Plaintiff's position open**

6          Plaintiff alleges that her transfer to the position of Technical Writer was a

7    violation of the ADA because she was an eligible employee able to return to her

8    position with reasonable accommodations and that the transfer was an adverse

9    action due to her disability.  ECF No. 94 at 16-17.  Even though the Court finds, as

10   discussed previously, that the transfer to Technical Writer was not an adverse

11   action, the Court will analyze Plaintiff's allegations and Defendant's responses

12   regarding these claims.

13         Defendant provided numerous justifications for transferring Plaintiff to the

14   position including Plaintiff's previously having expressed an interest in the

15   position, that it was a lateral move, and that the transfer would reduce the overall

16   headcount for the Hydro Division of the PUD which would help address budgetary

17   concerns that were due in part to a low snow-pack in the winter of 2009/2010.  *See*

18   ECF No. 54 at 12-13.  Plaintiff repeatedly asserts that these justifications are

19

20

21

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT ~ 49

pretext, *see e.g.*, ECF No. 94 at 17, but fails to provide evidence to create material issues of fact regarding these justifications.

Defendant submitted numerous memoranda from before Plaintiff's transfer that addressed the budget crisis and low snowpack, demonstrating these very real concerns were at play long before Plaintiff was transferred. *See e.g.*, ECF Nos. 54-6 and 54-7. Plaintiff responds by providing data for the winter of 2010/2011, *see* ECF No. 95-9, when Defendant had referred to the previous year's snowpack, 2009/2010, and Plaintiff fails to refute the legitimacy of the budgetary concerns. Instead, Plaintiff provides witness statements that allege, for example, that "moving Joanne to the Technical Writer position did not change the hydro division head count. It simply moved one employee from a position in hydro to a new position in hydro that had previously been eliminated." ECF No. 98 at 2.

Plaintiff's argument fails to recognize that Technical Writer was a position left vacant on the organizational chart in December of 2010. *See* ECF No. 54-12 at 7. In light of the fact that PUD had been operating with Ogden often absent from her position as Administrative Support Services Supervisor, allowing that position to be absorbed by the people who had covered for her absences and transferring her to a vacant position meant not having to hire a new employee to fill the vacant spot. Therefore, the transfer could lower costs in the future. The Court finds that

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 50

1    Plaintiff fails to create a genuine issue of material fact regarding Defendant's

2    proffered justifications.

3          Alternatively, even if the Court accepts Plaintiff's argument, despite

4    uncontroverted evidence rebutting it, that the transfer was solely due to Plaintiff's

5    "tagging in and tagging out," the transfer still would be a reasonable

6    accommodation.  As stated by Defendant

7                [b]y January, 2011, when [Plaintiff] moved to Technical Writer, the District
               had given her 25 weeks of leave and other accommodations, and her future
8                remained unclear.  ECF No. 74-1 at 6:21-9:21; 74:14. (She subsequently
               took nearly 74 additional weeks before resigning.  *Id*.)  By early 2011, the
9                District had the lawful authority to not only reassign her, but to discharge
               her.
10

11   ECF No. 109 at 4.

12         Throughout this case, Plaintiff asserts the importance of her supervisory

13   duties as an Administrative Support Services Supervisor (in an attempt to support

14   her argument that the transfer was a demotion), but in doing so, she makes clear

15   how the transfer was necessary.  Inherently, supervising others is an essential

16   function of a supervisory position, so her "tagging in and tagging out" which

17   amounted to her being gone from her worksite was a justifiable cause for

18   transferring her out of a position that required overseeing the work of others.

19         Plaintiff also fails to create a genuine issue of material fact regarding

20   whether or not the transfer was an "adverse employment action" due to her

21   disability.  The ADA explicitly lists "reassignment to a vacant position" as a

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT ~ 51

1    "reasonable accommodation," *see* 42 U.S.C.A. § 12111(9)(B), and as previously

2    discussed, there were numerous permissible justifications for the transfer.  In an

3    attempt to argue that the transfer was intended to set her up to fail, Plaintiff alleges

4    that she did not have requisite knowledge or training for the position, and to

5    respond to Defendant's assertion that she completed good work as a Technical

6    Writer, Plaintiff argues that she had to rely on the help of Jim Kennedy to do so.

7    *See* ECF No. 98 at 3.  Having to work with other employees in order to succeed is

8    not evidence of a lack of necessary skills.  As a matter of law, Plaintiff fails to

9    provide a genuine issue of material fact regarding Defendant's argument that the

10   transfer was justified and permissible.

11              **(b)  Defendant's failure to remove Woodward as supervisor**

12           Plaintiff's second claim for a lack of reasonable accommodation refers to the

13   fact that Dawn Woodward, director of the entire Hydro Division of the PUD, was

14   not completely removed from any supervisory authority over Plaintiff.  Plaintiff

15   cites to *Snyder v. Medical Serv. Corp.*, 145 Wash. 2d 233, 241 (2000), as she

16   recognizes that "a change in supervision is not normally deemed to be a reasonable

17   accommodation."  *See* ECF No. 94 at 17.  However, a closer review of the case

18   demonstrates a much stronger holding.

19           The *Snyder* court recognized that "several of the United States courts of

20   appeals have found there is no duty under the ADA to provide an employee with a

21   new supervisor as reasonable accommodation."  145 Wash. 2d at 241.  The Court

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT ~ 52

also held unequivocally, that "if [Plaintiff] can perform the job, then she has no disability requiring accommodation simply because she has a personality conflict with her supervisor." *Id*.

Even though Defendant was under no obligation to do so, the record in this case demonstrates an impressive attempt to appease Plaintiff's request. Plaintiff first requested this "accommodation" on a list of demands communicated through her attorney stating in relevant part that "[u]nder no circumstances is Ms. Ogden to work under the supervision of Ms. Woodward nor is Ms. Woodward to have any supervisory or other control over Ms. Ogden or her work." ECF No. 44-9 at 4. Defendant responded to Plaintiff's counsel by explaining that

> [t]he technical writer position is part of the Hydro Division. Ms. Woodward is the Director of that Division so she would technically be under Ms. Woodward's supervision. However, Ms. Ogden will report to the Training & SOP Supervisor, who reports to the Hydro Operations Manager, which would minimize, if not eliminate, the direct contact between Ms. Ogden and Ms. Woodward. In addition, the District will remove Ms. Woodward from any decisions regarding the material terms and/or conditions of Ms. Ogden's employment such as her compensation, evaluation of her work, discipline, or promotion or transfer.

ECF No. 44-10 at 3.

Although the Court finds as a matter of law that Plaintiff's requested accommodation was unreasonable, the Court also finds that Defendant provided reasonable accommodation.

Plaintiff relies on a maximum of a dozen brief encounters with Woodward over the course of nearly a year and testified that assignments that came from

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 53

1    Woodward were assigned to her through David Beech. *See* ECF No. 95-18 at 39-

2    42. Those brief encounters with Ms. Woodward still bothered Plaintiff as she

3    testified that "[j]ust back to all the correspondence I had with her, whether it was

4    verbal or not, I found objectionable," and she admits that her issue was with the

5    fact that she had to have any contact with Woodward at all. *Id*. Plaintiff fails to

6    create a genuine issue of material fact regarding any claim for a failure to

7    accommodate, and, therefore, the Court grants summary judgment on these claims.

8                    **2. ADA – Disparate treatment**

9            Plaintiff also alleges disparate treatment due to her alleged disability. As

10   discussed in detail regarding her FMLA-based retaliation claim, Plaintiff fails to

11   create a genuine issue of material fact regarding her allegations of discriminatory

12   animus, harassment, public humiliation, shunning, isolation, or the existence of a

13   hostile work environment. Although the Court has addressed these broad

14   allegations previously, Plaintiff provides additional specific allegations to support

15   a claim of disparate treatment. *See* ECF No. 94 at 17-22.

16           Plaintiff alleges the following as adverse actions that Defendant took against

17   her due to her alleged disability: (1) Plaintiff was not reinstated as Administrative

18   Support Services Supervisor and was "demoted" to Technical Writer; (2) PUD

19   delayed Ogden's career path, which delayed her salary increases; (3) PUD did not

20   provide training for Ogden to perform her new position as Technical Writer which

21   affected her ability to perform the job and to meet career path goals for

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT ~ 54

1    advancement; and (4) that PUD employees discriminated and retaliated against her

2    and did nothing to address her complaints to the point that Plaintiff's medical

3    doctor and counselor advised her to quit her job.  *See id*. at 18-19.

4         Additionally, Plaintiff argues that there is evidence of discriminatory animus

5    on the part of the PUD.[12]  *See id*. at 19-21.  However, Plaintiff only provides bare,

6    conclusory allegations that rely upon the same factual underpinnings of her other

7    claims which the Court found are properly dismissed on summary judgment.

8    Plaintiff alleges that she was treated differently after she was diagnosed with

9    cancer; that Woodward also discriminated against other disabled employees; and

10   that Ogden was treated differently from people without disabilities when she was

11   forced to discuss her disease, told to post a smiling or frowning face on her door,

12

13

14

15

16   _____

17   [12] Plaintiff's counsel lists different types of circumstantial evidence to support

18   allegations of animus, but there is insufficient evidence to support any of the

19   allegations.  The Court has considered these allegations, which counsel describes

20   as "elements" of circumstantial evidence, and finds no genuine issue of material

21   fact.

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT ~ 55

or when she was "shunned." *Id*. at 20.  Again, these claims are unsupported by evidence and fail to create a genuine issue of material fact.

In an effort to support her claims that Plaintiff "suffered a continual progressively (sic) worsening deterioration of her work environment," Plaintiff also lists the following "adverse employment actions":

- Public Humiliation:
    - Woodward discussing Ms. Ogden's medical condition with employees
    - Woodward forcing Ms. Ogden to discuss her medical condition and emotional issues with staff;
    - Woodward telling Ms. Ogden to post smiley face or frown face on her door to let staff know her mood;
    - Forced to return to the PUD offices to work before she was ready – caused her to have events where she soiled her pants.
- Demotion.  The transfer from Administrative Services Supervisor to Technical Writer was a demotion that involved a loss of prestige; a

move to an undesirable location; loss of management perks; and, a
dead-end career path.
- Shunning / Isolation
  - Removing Ms. Ogden from the management building;
  - Excluding her from social gatherings;
  - Employees were told not to associate with Ms. Ogden;
- Bullying; Woodward persistently bullied Ms. Ogden;
- Interfering with wage step increases;
- Failing to fully accommodate her disability;
- Refusing to investigate complaints of discrimination / retaliation.

ECF No. 94 at 21.[13]

Plaintiff's allegations of adverse employment actions and of corresponding

discriminatory animus are not supported by evidence.  Therefore, the Court finds

that Plaintiff's allegations are insufficient to support a genuine issue of material

fact and summary judgment is proper as to her claims of disparate treatment.

### B.  Washington Law Against Discrimination

"The WLAD encompasses two types of disability discrimination claims:

failure to accommodate claims and disparate treatment claims."  *Daniel v. Boeing*

*Co.,* 764 F. Supp. 2d 1233, 1242 (W.D. Wash. 2011).  The WLAD makes it an

"unfair practice" to "discriminate against any person in compensation or in other

---

[13] Plaintiff also cites to this list to support her claims of retaliation by arguing that

"[e]ach of the bullet-pointed examples of harassment above represents incidents of

retaliation and retaliatory animus taken against Ms. Ogden for exercising her rights

under the WLAD / ADA, FMLA and WSFLA."  ECF No. 94 at 24.

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT ~ 57

terms or conditions of employment because of … [among other reasons] the presence of any sensory, mental, or physical disability."  WASH. REV. CODE § 49.60.180.

As recognized by a Washington state court in *Hegwine v. Longview Fibre Co.*, 132 Wash. App. 546, 559, (2006) *aff'd*, 162 Wash. 2d 340 (2007), "RCW 49.60.180 does not set out the criteria for establishing a claim of sex or disability discrimination.  For this reason, our courts have considered interpretations of analogous federal law in discrimination cases."

Plaintiff's WLAD claims rely upon the same factual allegations that the Court previously addressed.  In light of the Court's granting summary judgment regarding Plaintiff's ADA claim, Plaintiff's WLAD claims similarly fail.[14]

**IV.  Defense argument #5 – Plaintiff has no claim for retaliation.**

A prima facie case of retaliation under either the ADA or the WLAD requires that plaintiff demonstrate that "(1) plaintiff engaged in protected activity,

---

[14] Plaintiff's Second Amended Complaint also alleges "termination" as a violation of the WLAD, but the uncontested fact is that she resigned from the PUD after the PUD encouraged her to return after her previously revoked resignations.  *See* ECF No. (44-1)-(44-19).  She alleges that she was forced to resign due to the conditions of her employment, but that claim is addressed below under section V, regarding "Constructive Discharge."

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 58

(2) she suffered an adverse employment action, and (3) there was a causal link between the two." *Daniel*, 764 F. Supp. 2d at 1245 (citing *Pardi v. Kaiser Found. Hosp.,* 389 F.3d 840, 849 (9th Cir. 2004); *Burchfiel v. Boeing Corp.,* 149 Wash. App. 468, 482 (2009)).

Importantly,

[d]iscrimination and retaliation claims under the ADA are both subject to the burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 [] (1973). *See Raytheon Co. v. Hernandez*, 540 U.S. 44, 49–50 & n. 3 [] (2003); *Brown v. City of Tucson,* 336 F.3d 1181, 1186–87 [] (9th Cir. 2003); *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1093 [] (9th Cir. 2001). Under that framework, an employee challenging an adverse employment action has the initial burden of establishing a prima facie case of discrimination (or retaliation). The burden then shifts to the employer to provide a legitimate, nondiscriminatory (or nonretaliatory) reason for the adverse employment action. If the employer does so, then the burden shifts back to the employee to prove that the reason given by the employer was pretextual. *See Raytheon*, 540 U.S. at 49–52 & n. 3; *Brown*, 336 F.3d at 1187; *Snead*, 237 F.3d at 1093.

*Curley v. City of N. Las Vegas*, 772 F.3d 629, 632 (9th Cir. 2014).

As the Court found above, Plaintiff has failed to create a genuine issue of material fact regarding any "adverse employment action." Accordingly, there can be no basis for this claim, and summary judgment is properly granted on these allegations of retaliation as well.

1    **V.  Defense argument #6 – Plaintiff has no claim for constructive discharge.[15]**

2         Defendant argues that Plaintiff is essentially claiming that she was forced to

3    quit after the conditions of her employment were no longer bearable.  "In order to

4    survive summary judgment on a constructive discharge claim, a plaintiff "must

5    show there are triable issues of fact as to whether 'a reasonable person in [her]

6    position would have felt that [she] was forced to quit because of intolerable and

7    discriminatory working conditions.'"  *Hardage*, 427 F.3d 1177, 1184 *amended on*

8    *denial of reh'g*, 433 F.3d 672, *amended on denial of reh'g*, 436 F.3d 1050 (quoting

9    *Steiner v. Showboat Operating Co.,* 25 F.3d 1459, 1465 (9th Cir. 1994)).

10        At the summary judgment stage, it is important to recognize that

11   [w]hether working conditions were so intolerable and discriminatory as to
12   justify a reasonable employee's decision to resign is normally a factual
     question for the jury.  In general, however, a single isolated incident is
13   insufficient as a matter of law to support a finding of constructive discharge.
     Thus, a plaintiff alleging a constructive discharge must show some
14   aggravating factors, such as a continuous pattern of discriminatory
     treatment.

15

16

17   _____
     [15] Plaintiff argues that "proof of constructive discharge is not necessary to support
18   an award of damages under the WLAD."  ECF No. 94 at 19.  However, her
19   complaint alleges constructive discharge, so the Court addresses this claim both as
20   its own basis for liability and insofar as it supports a discrimination claim.

21

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT ~ 60

1   *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1411-12 (9th Cir. 1996) (citing

2   *Sanchez v. City of Santa Ana,* 915 F.2d 424, 431 (9th Cir. 1990) (internal

3   quotations and citations omitted), *cert. denied,* 502 U.S. 815 (1991).

4          The court in *Schnidrig* affirmed the district court's granting summary

5   judgment of a constructive discharge claim because the plaintiff's "working

6   conditions were not so intolerable and discriminatory that a reasonable person

7   would feel forced to resign," there were legitimate nondiscriminatory reasons for

8   each of the actions complained of by Schnidrig, and the district court "found no

9   evidence to suggest either that any of these actions were motivated to force

10  Schnidrig to resign or that they made Schnidrig's working conditions intolerable."

11  *Schnidrig*, 80 F.3d at 1412.

12         Even viewing all evidence in the most favorable light for Plaintiff, her

13  allegations are, as a matter of law, insufficient to sustain a claim for constructive

14  discharge past the summary judgment stage.  Plaintiff's taking offense at

15  coworkers for not talking to her as much as she would have liked, not being

16  acknowledged sufficiently at a funeral, receiving emails or visits asking how she

17  was feeling, being introduced as a "new employee," ECF No. 102 at 23, having

18  "objectionable" interactions with her supervisor (both verbal and non-verbal), and

19  any and all of her other factual allegations fail to create genuine issues of material

20  fact regarding the "intolerable" nature of her work environment.

21

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT ~ 61

The record is devoid of any "aggravating circumstances," even accepting all of Plaintiff's allegations as valid. The PUD has provided evidence that it demonstrated significant efforts at making Plaintiff's former workplace supportive and encouraging.

## VI.  Defense argument #7 – Plaintiff has no claim for breach of a specific promise.

Plaintiff's counsel refers to this cause of action as a "handbook claim" and argues that Defendant entered into an employment contract that created "an atmosphere of job security and fair treatment with specific promises of specific treatment in specific situations," but that those promises were broken when Plaintiff was mistreated. *See* ECF No. 26 at 8-9. Plaintiff's counsel previously relied on a very similar claim in another case in this district. *See Salazar v. Monaco Enterprises, Inc.*, No. CV-12-0186-LRS, 2014 WL 1976601, at *3 (E.D. Wash. May 15, 2014). As Judge Suko explained in the prior case:

> *Korslund* [*v. DynCorp Tri–Cities Services, Inc.*, 156 Wash. 2d 168 (2005)] sets forth a three-step test that applies when the parties have not agreed that the provisions in an employee handbook constitute a contract, as is the situation here. The employee must prove these three elements of the cause of action [for breach of a promise of specific treatment]: (1) that a statement (or statements) in an employee manual or handbook or similar document amounts to a promise of specific treatment in specific situations, (2) that the employee justifiably relied on the promise, and (3) that the promise was breached. [*Id.*] at 178 (citations omitted).

*Id.* at *4. Plaintiff argues that the three listed elements "are questions of fact." ECF No. 94 at 26. To the contrary, elements are only elements. If there were

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 62

1    evidence disputing the applicability of those elements, then a question of fact

2    would exist.

3          To support this claim, Plaintiff alleges that Defendant's handbook promises

4    that employees would not "suffer adverse employment action for taking FMLA

5    leave, being disabled, or complaining about discrimination or retaliation."  ECF

6    No. 94 at 26.  Plaintiff continues by arguing that "PUD breached the promise of

7    specific treatment when it failed to protect her, and ultimately treated her so poorly

8    she was forced by her medical providers to quit her job."  *Id*.

9          Plaintiff is relying on the same factual assertions that underlie her other

10   claims that the Court determined are properly disposed of at this summary

11   judgment stage.[16]  In light of the fact that Plaintiff failed to present a genuine issue

12   of material fact regarding her allegations of adverse employment actions and poor

13   treatment, summary judgment likewise is granted on Plaintiff's "handbook" claim.

14

15

16

17

18

19   [16] Although the Court has not previously addressed a claim for "failure to protect,"

20   it seems this allegation refers to Plaintiff not being protected from the alleged

21   actions that underlie her other claims, i.e., harassment, discrimination, etc.

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT ~ 63

**VII.  Defense argument #8 – Plaintiff has no claim for negligent infliction of emotional distress.**

In finding that an employer owed no duty of care to avoid negligently inflicting emotional distress while dealing with an employee's complaints about a supervisor, the Supreme Court of Washington stated that they:

> reexamined liability for negligent infliction of emotional distress in *Hunsley v. Giard*, 87 Wash. 2d 424, 433[] (1976).  There we held a cause of action for same *does* exist in Washington but cautioned: "Not every act which causes harm results in legal liability."  *Id.* at 434 [].  As with any claim sounding in negligence, where a plaintiff brings suit based on negligent infliction of emotional distress "we test the plaintiff's negligence claim against the established concepts of duty, breach, proximate cause, and damage or injury."  *Id.* at 434 [].

*Snyder v. Med. Serv. Corp. of E. Washington*, 145 Wash. 2d 233, 243 (2001).  The *Snyder* court cited *Bishop v. State,* 77 Wash. App. 228 at 234 (1995), for the proposition that

> [t]he utility of permitting employers to handle workplace disputes outweighs the risk of harm to employees who may exhibit symptoms of emotional distress as a result.  The employers, not the courts, are in the best position to determine whether such disputes should be resolved by employee counseling, discipline, transfers, terminations or no action at all.  While such actions undoubtedly are stressful to impacted employees, the courts cannot guarantee a stress-free workplace.

*Snyder*, 145 Wash. 2d at 245 (2001).

Plaintiff properly recognized the limitation on claims for negligent infliction of emotional distress when they result from disciplinary acts or personality disputes, but seems to argue that that is not what is at issue here.  ECF No. 94 at 26-27.  Once again, Plaintiff's counsel listed the elements that a plaintiff must

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 64

1 prove to support this claim and concluded, "[e]ach of these issues is a question of

2 fact for the jury to resolve." *Id*. at 27.

3      In responding to Defendant's motion for summary judgment, Plaintiff only

4 offers bare, conclusory allegations, stating that "in the present case the subjective

5 intentional discriminatory and retaliatory conduct, was persistent and outrageous in

6 nature, causing Ogden to suffer severe emotional distress," and cites to her own

7 statement of facts. *See* ECF No. 94 at 27.  In order to proceed past a proper motion

8 to dismiss, a plaintiff must allege "more than labels and conclusions, and a

9 formulaic recitation of a cause of action's elements will not do." *Bell Atl. Corp. v.*

10 *Twombly*, 550 U.S. 544, 545 (2007).  Plaintiff's claim for negligent infliction of

11 emotional distress fails to clear that low hurdle, and it likewise falls far short of

12 raising an issue of material fact.

13      Plaintiff asserts that Defendant "owed Plaintiff a duty not to cause her severe

14 emotional harm by and through their discriminatory employment practices."  ECF

15 No. 94 at 27.  Even if the Court concedes the existence of that duty, which the

16 Court does not, there is no evidence supporting a breach of that duty.  Plaintiff

17 simply relies on the same factual basis that underlies this entire case to support this

18 claim.  As previously discussed, she fails to present a genuine issue of material fact

19 regarding such "discriminatory employment practices" by relying solely on

20 conclusory allegations.

21

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT ~ 65

1    The Court notes that Plaintiff alleges "intentional" conduct in this claim for

2  "negligent" infliction of emotional distress, but under either theory, Plaintiff's

3  claim fails to present a genuine issue of material fact.  Therefore, the Court grants

4  summary judgment on Plaintiff's claim for negligent infliction of emotional

5  distress.

6                                    CONCLUSION

7        Based on the foregoing considerations, the Court finds that there is no

8  genuine issue of material fact regarding any of Plaintiff's claims.  Accordingly, **IT**

9  **IS HEREBY ORDERED THAT**:

10       1.  Defendant's Motion for Summary Judgment, **ECF No. 40**, **amended as**

11  **ECF No. 72**, is **GRANTED**.

12       2.  All of Plaintiff's claims are **DISMISSED WITH PREJUDICE**.

13       3.  All pending motions are **DENIED AS MOOT**.

14       The District Court Clerk is directed to enter this Order, enter Judgment for

15  Defendant, provide copies of this Order to counsel, and **close this case**.

16       **DATED** this 30th day of March 2016.

17                           _s/ Rosanna Malouf Peterson_
                            ROSANNA MALOUF PETERSON
18                          United States District Judge

19

20

21

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT ~ 66